**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

CHAD COTTLE, derivatively on behalf of
MACROGENICS, INC.,

c/o Timothy Brown Esq.
The Brown Law Firm, P.C.
767 Third Avenue,
Suite 2501
New York, NY 10017

     *Plaintiff*,

     v.

MACROGENICS, INC.,
9704 Medical Center Drive
Rockville, Maryland 20850

     Serve on:
     THE CORPORATION TRUST
     COMPANY
     1209 Orange Street
     Wilmington, DE 19801

     *Nominal Defendant*,

and

WILLIAM HEIDEN
c/o MacroGenics, Inc.
9704 Medical Center Drive
Rockville, Maryland 20850

and

SCOTT KOENIG
c/o MacroGenics, Inc.
9704 Medical Center Drive
Rockville, Maryland 20850

and

KAREN FERRANTE
c/o MacroGenics, Inc.
9704 Medical Center Drive
Rockville, Maryland 20850

**Case No. 8:24-cv-03578**

**DEMAND FOR JURY TRIAL**

and

EDWARD HURWITZ
c/o MacroGenics, Inc.
9704 Medical Center Drive
Rockville, Maryland 20850

and

SCOTT JACKSON
c/o MacroGenics, Inc.
9704 Medical Center Drive
Rockville, Maryland 20850

and

MEENU CHHABRA KARSON
c/o MacroGenics, Inc.
9704 Medical Center Drive
Rockville, Maryland 20850

and

MARGARET A. LIU
c/o MacroGenics, Inc.
9704 Medical Center Drive
Rockville, Maryland 20850

and

FEDERICA O'BRIEN
c/o MacroGenics, Inc.
9704 Medical Center Drive
Rockville, Maryland 20850

and

JAY SIEGEL
c/o MacroGenics, Inc.
9704 Medical Center Drive
Rockville, Maryland 20850

and

DAVID STUMP
c/o MacroGenics, Inc.

9704 Medical Center Drive
Rockville, Maryland 20850

*Defendants.*

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Chad Cottle ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant MacroGenics, Inc. ("MacroGenics" or the "Company"), files this Verified Shareholder Derivative Complaint against William Heiden ("Heiden"), Scott Koenig ("Koenig"), Karen Ferrante ("Ferrante"), Edward Hurwitz ("Hurwitz"), Scott Jackson ("Jackson"), Meenu Chhabra Karson ("Karson"), Margaret A. Liu ("Liu"), Federica O'Brien ("O'Brien"), Jay Siegel ("Siegel") and David Stump ("Stump") (collectively, the "Individual Defendants," and together with MacroGenics, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of MacroGenics, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act against Defendant Koenig. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding MacroGenics, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

3

Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from March 7, 2024 to May 9, 2024, at least (the "Relevant Period").

2.     MacroGenics is a Delaware corporation based in Maryland focused on discovering, developing, manufacturing and commercializing innovative antibody-based therapeutics for the treatment of cancer. To this end, the Company has a pipeline of product candidates designed to target either various tumor-associated antigens or immune checkpoint molecules. Two products from the Company's pipeline have been approved by the U.S. Food and Drug Administration ("FDA").

3.     MacroGenics' lead pipeline program is vobramitamab duocarmazine ("vobra duo"), an antibody-drug conjugate (ADC) that targets B7-H3, a molecule in the B7 family of immune regulator proteins that is widely expressed by several different tumor types.

4.     In late 2023, MacroGenics began the TAMARACK Phase 2 study focusing on vobra duo in patients with metastatic castration-resistant prostate cancer ("mCRPC"). During the Relevant Period, the Individual Defendants made materially positive statements regarding the TAMARACK Phase 2 study while simultaneously concealing materially adverse facts related to early interim safety data results from the TAMARACK Phase 2 study.

5.     On May 9, 2024, the truth began to emerge when MacroGenics provided interim updated safety and efficacy data for its TAMARACK Phase 2 study. The updated data revealed that vobra duo's adverse event rate exceeded 98.9% and 100% for both the 2.0 mg/kg and 2.7

4

mg/kg dosages, respectively, and that adverse events grade 3 or greater exceeded 50% for both dosages. The Company further revealed that there were five fatalities, three of which were being investigated for possible links to the TAMARACK Phase 2 study.

6.      On this news, the price of the Company's stock fell 77.4%, or $11.36 per share, from a closing price of $14.67 per share on May 9, 2024 to close at $3.31 per share on May 10, 2024.

7.      During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the vobra duo's full safety profile; (2) the totality of the Phase 2 TAMARACK study data; and (3) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

8.      In light of the Individual Defendants' misconduct—which has subjected the Company, its CEO, President and a Company director to a federal securities fraud class action lawsuit pending in the United States District Court for the District of Maryland (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein— the Company will have to expend many millions of dollars.

9.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

10.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the CEO's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

12.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

15.     Plaintiff is a current shareholder of MacroGenics. Plaintiff has continuously held

MacroGenics common stock since July 8, 2022.

### Nominal Defendant MacroGenics

16.     MacroGenics is a Delaware corporation with its principal executive offices at 9704

Medical Center Drive, Rockville, MD, 20850. MacroGenics's shares trade on the Nasdaq

("NASDAQ") under the ticker symbol "MGNX."

### Defendant Koenig

17.     Defendant Koenig is CEO, President, and a Company director and has served in

those roles since co-founding the Company in September 2001.  According to the Company's

Schedule 14A filed with the SEC on April 23, 2024 (the "2024 Proxy Statement"), as of March

22, 2024, Defendant Koenig beneficially owned 3,173,050 shares of the Company's common

stock. Given that the price per share of the Company's common stock at the close of trading on

March 22, 2024 was $14.48, Defendant Koenig owned approximately $46 million worth of

MacroGenics stock as of that date.

18.     The 2024 Proxy Statement stated the following about Defendant Koenig:

Dr. Koenig has been our President, Chief Executive Officer and a director since
September 2001 and was one of our co-founders. Prior to joining MacroGenics, Dr.
Koenig served as Senior Vice President of Research at MedImmune, Inc., where he
participated in the selection and maturation of its product pipeline. From 1984 to
1990, he worked in the Laboratory of Immunoregulation at the National Institute
of Allergy and Infectious Diseases at the National Institutes of Health, where he
investigated the immune response to retroviruses and studied the pathogenesis of
AIDS. Dr. Koenig currently serves as a member of the Board of Directors of
GlycoMimetics, Inc., and previously served as Chairman of the Board of Directors
of Applied Genetic Technologies Corporation until its acquisition in 2022, both
publicly held companies. Additionally, Dr. Koenig serves on the Board of Directors
of the International Biomedical Research Alliance and the Biotechnology

Innovation Organization ("BIO"). Dr. Koenig received his A.B. and Ph.D. from Cornell University and his M.D. from the University of Texas Health Science Center in Houston. We believe that Dr. Koenig's detailed knowledge of our company and his over 30 years in research and the biotechnology industry provide a valuable contribution to our Board.

**Defendant Heiden**

19.     Defendant Heiden has served as a Company director and as Chair of the Board since May 2022. Defendant Heiden also serves as Chair of the Board's Human Capital Management Committee and as a member of the Audit Committee. According to the 2024 Proxy Statement, as of March 22, 2024, Defendant Heiden beneficially owned 44,915 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 22, 2024 was $14.48, Defendant Heiden owned approximately $650,369 worth of MacroGenics stock as of that date.

20.     For Fiscal Year 2023, Defendant Heiden received $180,126 in compensation from the Company.

21.     The 2024 Proxy Statement stated the following about Defendant Heiden:

Mr. Heiden has served as chair of our Board of Directors since May 2022. Mr. Heiden brings over 35 years of experience in the biotechnology and pharmaceutical industry to the MacroGenics Board of Directors. Mr. Heiden most recently served as President, Chief Executive Officer and board member of AMAG Pharmaceuticals building a diverse portfolio of commercial and development-stage products from May 2012 to January 2020. Prior to joining AMAG, he served as President and Chief Executive Officer of Genzyme Transgenics Company (GTC), from June 2010 to May 2012, which was acquired by LFB, S.A. Prior to joining GTC, Mr. Heiden was President, Chief Executive Officer and board member of venture-backed Elixir Pharmaceuticals from 2004 to 2008. Prior to joining Elixir, Mr. Heiden served as President and Chief Operating Officer of Praecis Pharmaceuticals from 2002 to 2004, which was acquired by GSK. From 1987 to 2002, Mr. Heiden progressed through various positions of increasing responsibility at Schering-Plough Corporation (now Merck & Co.), including managing a number of businesses in the United States, Europe and Canada. Mr. Heiden also serves on the Board of Directors of Atara Biotherapeutics, Inc., a publicly held company. He also serves on the boards of privately held companies Third Pole Therapeutics, CoreA Therapeutics He also serves on the board of Boston Collegiate Charter

School, a non-profit organization. Heiden holds an M.B.A. from Cornell University's Johnson Graduate School of Management, a Master's in International Management from the University of Louvain (Belgium) and a B.A. degree in finance from the University of Florida. The Board believes that Mr. Heiden's 30 plus years of pharmaceutical industry experience leading organizations in both large pharmaceutical and emerging biotechnology companies, significant commercial expertise, and strong deal making experience qualify him to serve as a member of our Board.

**Defendant Ferrante**

22.    Defendant Ferrante has served as a Company director since 2017. She also serves as a member of the Board's Nominating and Governance Committee and Science and Technology Committee. According to the 2024 Proxy Statement, as of March 22, 2024, Defendant Ferrante beneficially owned 145,172 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 22, 2024 was $14.48, Defendant Ferrante owned approximately $2.1 million worth of MacroGenics stock as of that date.

23.    For Fiscal Year 2023, Defendant Ferrante received $135,751 in compensation from the Company.

24.    The 2024 Proxy Statement stated the following about Defendant Ferrante:

Dr. Ferrante has served as a director since January 2017. Dr. Ferrante, a hematologist-oncologist, most recently served as Chief Medical Officer and Head of Research and Development at Tokai Pharmaceuticals and brings over 25 years of oncology drug development experience to the Board. Prior to Tokai, Dr. Ferrante held several senior level positions at Millennium Pharmaceuticals Inc. and parent company Takeda Pharmaceuticals, including Oncology Therapeutic Area Head, Takeda Cambridge Site Head and Chief Medical Officer. Dr. Ferrante previously held positions of increasing responsibility at Pfizer Global Research and Development and Bristol-Myers Squibb. Dr. Ferrante holds an M.D. from Georgetown University and completed her internship and residency in internal medicine at New England Deaconess Hospital (now part of Beth Israel Deaconess Medical Center) followed by a fellowship in hematology and oncology. She currently serves as a member of the board of Cogent Biosciences, a publicly traded biopharmaceutical company. She previously served on the board of Hutch-Med (formerly Chi-Med) a publicly traded biopharmaceutical company and Progenics

9

Pharmaceuticals, Inc. and Baxalta Inc., previously publicly traded biopharmaceutical companies. She also served on the scientific advisory board of Kazia Therapeutics (2016-2022) and the Trillium Therapeutics' scientific advisory board until its acquisition by Pfizer in 2021. Based on Dr. Ferrante's depth of experience in the biotechnology industry, ranging from executive officer to director roles, the Board believes Dr. Ferrante has the appropriate set of skills to serve as a member of our Board.

**Defendant Hurwitz**

25.    Defendant Hurwitz has served as a member of the Board since October 2004. Defendant Hurwitz also serves as a member of the Board's Nominating and Governance Committee and Science and Technology Committee. According to the 2024 Proxy Statement, as of March 22, 2024, Defendant Hurwitz beneficially owned 123,840 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 22, 2024 was $14.48, Defendant Hurwitz owned approximately $1.8 million worth of MacroGenics stock as of that date.

26.    For Fiscal Year 2023, Defendant Hurwitz received $147,626 in compensation from the Company.

27.    The 2024 Proxy Statement stated the following about Defendant Hurwitz:

Mr. Hurwitz has served as a director since October 2004. From 2017 to 2023 Mr. Hurwitz was a Managing Director of MPM Capital, a life sciences venture capital firm. Prior to joining MPM Capital, Mr. Hurwitz was the founding Managing Director of Precision Bioventures, LLC, a consulting and investment advisory firm. He was a director of Alta BioPharma III, L.P., and Alta Partners VIII, L.P., funds affiliated with Alta Partners, a venture capital firm, from 2002 through December 2014. Mr. Hurwitz also serves as a director of Dyne Therapeutics, a publicly held company. Mr. Hurwitz also served on the Board of Directors of Applied Genetic Technologies Corporation until its acquisition in 2022. Mr. Hurwitz received J.D. and M.B.A degrees from the University of California at Berkeley in 1990 and a B.A. in molecular biology from Cornell University in 1985. The Board believes that Mr. Hurwitz's financial and scientific expertise, as well as his deep understanding of the biotechnology industry, makes him an important asset to our Board as it assesses both financial and strategic decisions.

10

**Defendant Jackson**

28.     Defendant Jackson has served as a member of the Board since January 2017. Defendant Jackson also serves as a member of the Audit Committee. According to the 2024 Proxy Statement, as of March 22, 2024, Defendant Jackson beneficially owned 119,916 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 22, 2024 was $14.48, Defendant Jackson owned approximately $1.7 million worth of MacroGenics stock as of that date.

29.     For Fiscal Year 2023, Defendant Jackson received $167,626 in compensation from the Company.

30.     The 2024 Proxy Statement stated the following about Defendant Jackson:

Mr. Jackson has served as a director since January 2017. Mr. Jackson served as Chief Executive Officer and as a member of the Board of Directors of Celator Pharmaceuticals, Inc. from April 2008 until July 2016, when the company was acquired by Jazz Pharmaceuticals plc. Mr. Jackson has more than 30 years of experience in the pharmaceutical and biotechnology industry and has held positions of increasing responsibility in sales, marketing and commercial development at Eli Lilly and Company, SmithKline Beecham, ImClone Systems Inc., Centocor Inc., a division of Johnson & Johnson, Eximias Pharmaceutical and YM BioSciences. Mr. Jackson serves as a director of GlycoMimetics, Inc., Spero Therapeutics, Inc., and Mural Oncology plc; all publicly held companies. Mr. Jackson serves on the audit committees of GlycoMimetics, Inc., Spero Therapeutics, Inc., and Mural Oncology plc. Our Board has determined that simultaneous service on more than three audit committees of public companies by Mr. Jackson does not impair his ability to serve on our Audit Committee nor does it represent or in any way create a conflict of interest for the Company. Mr. Jackson also serves on the Board of Directors of Philabundance, a non-profit organization addressing food insecurity in the Philadelphia region. He holds a B.S. in pharmacy from the Philadelphia College of Pharmacy and Science and an M.B.A. from the University of Notre Dame. Based on Mr. Jackson's depth of experience in the pharmaceutical and biotechnology industries ranging from executive officer to director roles and experience with commercial development, the Board believes Mr. Jackson has the appropriate set of skills to serve as a member of our Board.

**Defendant Karson**

31.     Defendant Karson has served as a member of the Board since January 2023.

Defendant Karson also serves as a member of the Audit Committee and Human Capital Management Committee. According to the 2024 Proxy Statement, as of March 22, 2024, Defendant Karson beneficially owned 51,827 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 22, 2024 was $14.48, Defendant Karson owned approximately $750,455 worth of MacroGenics stock as of that date.

32.     For Fiscal Year 2023, Defendant Karson received $335,407 in compensation from the Company.

33.     The 2024 Proxy Statement stated the following about Defendant Karson:

Ms. Chhabra Karson has served as a director since January 2023. Since July 2023, Ms. Chhabra Karson has served as Executive Chair of Samsara Therapeutics. She previously served as President and Chief Executive Officer of Proteostasis Therapeutics from May 2014 until December 2020. From 2007 to 2014, Ms. Chhabra Karson was President and Chief Executive Officer at Allozyne, Inc. Prior to her time at Allozyne, she served as the Chief Business Officer at BioXell SpA and has also held roles of increasing responsibility at Novartis, Warner-Lambert Company, LLC, and Bristol-Myers Squibb. Ms. Chhabra Karson obtained her M.B.A. from York University and her B.Sc. from the University of Toronto. The Board believes that Ms. Chhabra Karson's more than 20 years of operational leadership in biopharmaceutical companies and financial expertise qualify her to serve as a member of our Board.

**Defendant Liu**

34.     Defendant Liu has served as a member of the Board since January 2023. Defendant Liu also serves as a member of the Nominating and Governance Committee and Science and Technology Committee. According to the 2024 Proxy Statement, as of March 22, 2024, Defendant Liu beneficially owned 37,915 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 22, 2024 was $14.48, Defendant Liu owned approximately $549,009 worth of MacroGenics stock as of that date.

35.     For Fiscal Year 2023, Defendant Liu received $318,324 in compensation from the

Company.

36.     The 2024 Proxy Statement stated the following about Defendant Liu:

Dr. Liu has served as a director since January 2023. Dr. Liu has served as the Chief Executive Officer of PAX Therapeutics since 2020. She is an Adjunct Full Professor at the University of California, San Francisco and Hedersdoktor with scientific affiliation in the Department of Medicine at the Karolinska Institutet. Dr. Liu widely consults for companies and NGOs such as WHO through her activities as Principal of ProTherImmune LLC and previously held positions of increasing responsibility at Merck & Co. andChiron Corporation. She is a Board Member of the International Society for Vaccines (and President Emerita) as well as a Director of Ipsen, where she chairs the Ethics and Governance Committee and is a member of the Innovation and Development Committee. She served on the boards of Transgene, Sangamo Biosciences, Adjuvance Technologies and the International Vaccine Institute (established by the United Nations), and was Senior Advisor in Vaccinology at the Bill & Melinda Gates Foundation. Dr. Liu obtained an M.D. from Harvard Medical School and a B.A. in Chemistry from Colorado College. She completed an Internship and Residency in Internal Medicine and a Fellowship in Endocrinology, all at Massachusetts General Hospital/Harvard Medical School and was an Instructor in Medicine at Harvard University. She also was a Visiting Scientist at MIT where she pioneered bispecific antibodies and an Adjunct Assistant Professor of Medicine at the University of Pennsylvania and a member of the NIH NIAID Advisory Council. The Board believes that Dr. Liu's medical training and more than 30 years of experience in biotechnology and pharmaceuticals qualify her to serve as a member of our Board.

**Defendant O'Brien**

37.     Defendant O'Brien has served as a member of the Board since February 2021. Defendant O'Brien also serves as Chair of the Audit Committee and as a member of the Human Capital Management Committee. According to the 2024 Proxy Statement, as of March 22, 2024, Defendant O'Brien beneficially owned 108,996 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 22, 2024 was $14.48, Defendant O'Brien owned approximately $1.6 million worth of MacroGenics stock as of that date.

38.     For Fiscal Year 2023, Defendant O'Brien received $152,001 in compensation from the Company.

39.     The 2024 Proxy Statement stated the following about Defendant O'Brien:

Ms. O'Brien has served as a director since February 2021. Ms. O'Brien is President of CFO'Brien Consulting, LLC which she founded in 2018, providing strategic and operational consulting, and flex time chief financial officer services primarily for biotech companies. She most recently served as Chief Financial Officer of Complexa Inc. from 2015 to 2017. Previously, Ms. O'Brien served as Chief Financial Officer of Cerecor Inc. from 2013 to 2015, and as Chief Financial Officer and Chief Operating Officer of Cervilenz, Inc. from 2011 to 2013. Ms. O'Brien was also Chief Financial Officer at Cardiokine Inc., a private biotech, and a Controller at Barrier Therapeutics, Inc., and Chief Financial Officer at Infonautics, Inc., both publicly held companies. Ms. O'Brien currently serves on the Board of Directors of TELA Bio, Inc. where she also chairs the Audit Committee. She began her career at public accounting firms, most recently as an Audit Manager for Coopers & Lybrand. Ms. O'Brien received her B.A. in Accounting from Rutgers University and is a Certified Public Accountant-Inactive, retired after thirty-eight years. The Board believes that Ms. O'Brien's over 25 years of financial and operational leadership in biopharmaceutical, medical device, and technology companies and strong financial expertise qualify her to serve as a member of our Board.

**Defendant Siegel**

40.     Defendant Siegel has served as a member of the Board since November 2017. Defendant Siegel also serves as Chair of the Science and Technology Committee and as a member of the Human Capital Management Committee. According to the 2024 Proxy Statement, as of March 22, 2024, Defendant Siegel beneficially owned 152,967 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 22, 2024 was $14.48, Defendant Siegel owned approximately $2.2 million worth of MacroGenics stock as of that date.

41.     For Fiscal Year 2023, Defendant Siegel received $167,206 in compensation from the Company.

42.     The 2024 Proxy Statement stated the following about Defendant Siegel:

Dr. Siegel has served as a director since November 2017. He most recently served as Chief Biotechnology Officer and Head of Scientific Strategy and Policy at Johnson & Johnson, which he joined in 2003, and on the Executive Committees and Boards of BIO and the Alliance for Regenerative Medicine and previously at

Johnson & Johnson as Company Group President for Biotechnology, Immunology, and Oncology. Prior to joining Johnson & Johnson, Dr. Siegel had a distinguished 20-year career at the Food and Drug Administration ("FDA") in positions of increasing responsibility, including directing the office responsible for reviewing and approving therapeutic biologics. Dr. Siegel currently is a member of the National Academies' Forum on Regenerative Medicine. He received a B.S. in Biology from the California Institute of Technology and an M.D. from Stanford University. He trained in internal medicine at the University of California, San Francisco, and in infectious diseases and immunology at Stanford University. The Board believes that Dr. Siegel's medical training and more than 35 years of experience in biotechnology qualify him to serve as a member of our Board.

**Defendant Stump**

43.    Defendant Stump has served as a member of the Board since September 2013. Defendant Stump also serves as Chair of the Nominating and Governance Committee and as a member of the Science and Technology Committee. According to the 2024 Proxy Statement, as of March 22, 2024, Defendant Stump beneficially owned 123,840 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 22, 2024 was $14.48, Defendant Stump owned approximately $1.8 million worth of MacroGenics stock as of that date.

44.    For Fiscal Year 2023, Defendant Stump received $160,751 in compensation from the Company.

45.    The 2024 Proxy Statement stated the following about Defendant Stump:

Dr. Stump has served as a director since September 2013. Dr. Stump was most recently Executive Vice President, Research and Development at Human Genome Sciences, Inc., where he was employed from November 1999 until his retirement in December 2012. Dr. Stump also serves as a director of REGENXBIO, Inc., which is a publicly held company. He was previously a director of Dendreon Corporation, Portola Pharmaceuticals, Inc. and Sunesis Pharmaceuticals, Inc., all publicly held companies. He also serves on the board of trustees of Earlham College. He holds an A.B. from Earlham College and an M.D. from Indiana University and completed his residency and fellowship training in internal medicine, hematology, oncology, and biochemistry at the University of Iowa. The Board believes that Dr. Stump's medical training and 23 years of experience in research and development and operations in the biotechnology industry, as well as

15

his public company board service, qualify him to serve as a member of our Board.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

46.     By reason of their positions as officers, directors, and/or fiduciaries of MacroGenics and because of their ability to control the business and corporate affairs of MacroGenics, the Individual Defendants owed MacroGenics and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage MacroGenics in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of MacroGenics and its shareholders so as to benefit all shareholders equally.

47.     Each director and officer of the Company owes to MacroGenics and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

48.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of MacroGenics, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

49.     To discharge their duties, the officers and directors of MacroGenics were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

50.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their

16

obligations as directors and officers of MacroGenics, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of MacroGenics's Board at all relevant times.

51.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

52.     To discharge their duties, the officers and directors of MacroGenics were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of MacroGenics were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Maryland, Delaware, and the United States, and

pursuant to MacroGenics's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how MacroGenics conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of MacroGenics and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that MacroGenics's operations would comply with all applicable laws and MacroGenics's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

53.    Each of the Individual Defendants further owed to MacroGenics and the shareholders the duty of loyalty requiring that each favor MacroGenics's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

54.    At all times relevant hereto, the Individual Defendants were the agents of each other and of MacroGenics and were at all times acting within the course and scope of such agency.

55.    Because of their advisory, executive, managerial, directorial, and controlling positions with MacroGenics, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

56.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by MacroGenics.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

57.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

58.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate

assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

59.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of MacroGenics was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

60.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

61.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of MacroGenics and was at all times acting within the course and scope of such agency.

### MACROGENICS' CODE OF CONDUCT

62.     MacroGenics's Code of Conduct applies to all "directors, officers and employees

of the Company, as well as all contractors, vendors and consultants when acting on our behalf and who are directed to engage in or, are involved in activities relating to the research, development, manufacture or commercialization of our products (collectively, 'Personnel')."

63.     The Code of Conduct states that the Company is "committed to the highest level of ethical conduct because integrity and excellence drives everything we do."

64.     The Code of Conduct instructs Personnel that, if they "believe that actions have taken place, may be taking place, or may be about to take place that violate or would violate the Code, other Company policies or any law, rule, regulations applicable to the Company, whether accidental or deliberate[,]" then they are "obligated to bring the matter to the attention of the Company."

65.     Under a section titled "Conflicts of Interest," the Code of Conduct states, in relevant part, "[p]ersonnel must avoid any personal activity, investment or association that may interfere (or may appear to interfere) with using good judgment concerning the Company's best interests. Personnel may not exploit position or relationship with the Company for personal gain."

66.     In a section titled "Fair Dealing; No Misrepresentations," the Code of Conduct states the following:

> Competing vigorously, yet lawfully, with competitors and establishing advantageous, but fair, business relationships with customers and suppliers is a part of the foundation for long-term success. However, unlawful and unethical conduct, which may lead to short term gains, may damage the Company's reputation and long-term business prospects. Accordingly, Personnel must deal ethically and lawfully with the Company's collaborators, customers, suppliers, competitors and employees in all business dealings. No Personnel shall take unfair advantage of another person in business dealings on the Company's behalf through the abuse of privileged or confidential information or through improper manipulation, concealment or misrepresentation of material facts.
>
> The Company has a "no tolerance" policy for anyone engaging in business disparagement or similar behavior. Business disparagement includes making inappropriate, disparaging, damaging or negative comments about a competitor,

customer, or vendor, including such person's products, services, employees, business practices or financial condition.

67.    Regarding "Financial Information and Records," in a subsection titled "Public Reporting of Financial and non-Financial information[,]" the Code of Conduct states the following:

> All reports and documents we file or submit to the Securities and Exchange Commission (the "SEC") and any earnings releases and similar public communications made by the Company must be full, fair, accurate, timely and understandable. Personnel who are responsible for these filings and disclosures must use reasonable judgement and perform responsibilities honestly, ethically and objectively. Personnel involved in certain periodic reports (such as Form 10-K and Form 10-Q) must report to the Audit Committee on an ongoing basis the following matters which come to their attention:
>
> • Deviations from or changes to the current public information available for the Company;
>
> • Changes in risks, or new risks to the Company as they are identified; and
>
> • Changes that may affect the Company's financial results.
>
> Personnel with budget responsibility, signing authority and/or financial reporting responsibility (collectively, "financial managers") hold an important and elevated role in corporate governance. They are empowered to ensure that stockholder interests are appropriately balanced, protected and preserved. Accordingly, all financial managers are expected to uphold the following standards:
>
> • To provide information that is accurate, complete, objective, relevant, timely and understandable;
>
> • To comply with laws, rules and regulations of federal, state, and local governments and appropriate regulatory agencies;
>
> • To act in good faith, responsibly, with due care, competence and diligence, without misrepresenting facts or allowing their independent judgment to be subordinated;
>
> • To respect the confidentiality of information acquired in connection with their activities for the Company, except when authorized or otherwise legally obligated to disclose;
>
> • To share knowledge and to maintain skills needed to perform their jobs;

• To promote ethical behavior as a responsible partner among peers in the workplace and community; and

• To achieve responsible use of and control over all assets and resources employed by or entrusted to them.

68.    Regarding "Record Keeping," the Code of Conduct states the following:

The Company requires honest, accurate and complete recording and reporting of information in order to make responsible business decisions. For example, you are responsible for reporting only true and actual number of hours worked and you must appropriately document and report all legitimate business expenses. You should avoid exaggeration, derogatory remarks, guesswork, or inappropriate characterizations of people and companies that can be misunderstood. This applies in all contexts. Business records and communications may become public in many contexts and you should be particularly sensitive to written communications including e-mail, texts, internal memos, and formal reports. Mistakes should never be covered up; they should immediately be fully disclosed to the Compliance Officer who will establish an appropriate correction plan to the extent possible. Remember, misconduct cannot be excused because it was directed or requested by another. You may not falsify or destroy records to hide non-compliance or falsely demonstrate compliance with laws, regulations, or contract requirements.

69.    In a subsection titled "Use of Insider Information," the Code of Conduct states the following:

It is illegal to buy or sell Company securities using material information not available to the public. Persons who give such nonpublic "inside" information to others may be as liable as persons who trade securities while possessing such information. Federal securities laws may be violated if Personnel, or any relatives or friends, trade in the securities of the Company, its customers, collaborators, suppliers or other party, while possessing "inside" information. This remains true even in the event Personnel are no longer working for the Company. For example, Personnel involved in a major transaction with a third party (such as an acquisition, license, collaboration, investment or sale), may not trade in that party's securities until the information becomes public or is no longer material. For more information on duties and responsibilities relating to buying or selling Company securities, please consult the Insider Trading Policy.

***Corporate Governance Guidelines***

70.    MacroGenics represents that the Company's Corporate Governance Guidelines were adopted to "assist the Board in exercising its responsibilities," "reflect the Board's

23

commitment to building long- term stockholder value with an emphasis on responsible corporate governance," and "are intended to comply with, and to supplement, federal and state laws and regulations applicable to the Company, including the Delaware General Corporation Law, the Amended and Restated Certificate of Incorporation and Amended and Restated By-Laws (the "By-Laws") of the Company, and any applicable rule or regulation of any stock exchange."

71.    Regarding "Risk Oversight," the Corporate Governance Guidelines state the following:

> The Board administers its risk oversight function directly through the Board as a whole, as well as through its various standing committees that address risks inherent in their respective areas of oversight. In particular, the Board is responsible for monitoring and assessing strategic risk exposure. The Audit Committee is responsible for overseeing the Company's major financial risk exposures and the steps the Company's management has taken to monitor and control these exposures, including cyber-security. The Audit Committee also monitors compliance with legal and regulatory requirements and considers and, if appropriate, approves any related party transactions. The Nominating Committee monitors the effectiveness of the Company's corporate governance. The Compensation Committee assesses and monitors whether any of the Company's compensation policies and programs has the potential to encourage excessive risk-taking. Throughout the year, senior management reviews the Company's risks with the Board at regular Board meetings as part of management presentations that focus on particular business functions, operations, or strategies, and presents the steps taken by management to mitigate or eliminate such risks.

72.    In violation of the Code of Conduct and Corporate Governance Guidelines, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and the aiding and abetting thereof. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and

failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct.

## MACROGENICS' AUDIT COMMITTEE CHARTER

73.    MacroGenics' Audit Committee Charter states that the main function of the Audit Committee is to:

> [P]rovide assistance to the Board in fulfilling its responsibilities relating to corporate accounting and auditing, reporting practices of the Company, the quality and integrity of the financial reports of the Company, the Company's systems of internal controls regarding finance, accounting, legal compliance, ethics, privacy and cyber-security that management and the Board have established, the performance of the Company's internal audit function and the registered public accounting firm ("independent auditor"), and the qualifications and independence of the Company's independent auditor.

74.    In a section titled "Duties and Responsibilities," the Audit Committee Charter states that the Audit Committee has the following duties and responsibilities with respect to its "Oversight of Financial Reporting":

> • Review and approve the Company's quarterly financial statements and the related discussion and analysis of financial condition and results of operations prepared by management to be included in the Company's quarterly reports and discuss this information with management and the independent auditor.
>
> • Review management's report on internal control over financial reporting and the independent auditor's attestation as required by applicable law, and approve the disclosure in the Company's Annual Report on Form 10-K and Quarterly Report on Form 10-Q.
>
> • Review and discuss with management earnings press releases, anticipated earnings call disclosures, if any, and discuss with management financial information and earnings guidance provided to analysts prior to their release, including the type and presentation of information, paying particular attention to any pro forma or adjusted non-GAAP information. Such discussions may be in general terms (i.e., discussion of the types of information to be disclosed and the type of presentations to be made).
>
> • Review other significant financial releases with the Chief Financial Officer and other members of management prior to the public release of such information.

• Prepare an annual committee report for inclusion where necessary in the proxy statement of the Company relating to its annual meeting of security holders.

• Review and evaluate the Company's practices with respect to the use of non-GAAP disclosures in periodic reports, earnings press releases, earnings guidance, and other financial presentations.

• Consider and review with the internal auditor, if any, and the independent auditor:

> the adequacy, effectiveness and efficiency of management processes, internal financial systems and operating controls including computerized information system controls and security; o any related significant findings and recommendations of the independent auditor and internal auditing together with management's responses thereto; and

> critical accounting policies and estimates, as well as the existence and substance of other significant accounting accruals, reserves, contingencies, or estimates made by management that could have a material impact on the financial statements.

• Review with management, the internal auditor, if any, and the independent auditor at the completion of the annual examination:

> the Company's annual financial statements and related footnotes;

> the independent auditor's audit of the financial statements and their report thereon; compliance with requirements of the SEC;

> any significant changes required in the independent auditors' audit plan;

> any serious difficulties or disputes with management encountered during the course of the external audit;

> management's explanations of significant variances in the annual financial statements between years and determines whether the data are consistent with the Management's Discussion and Analysis ("MD&A") section of the annual report, review with management the MD&A section of the Company's periodic reports and ask the extent to which the independent auditor reviewed the MD&A section; and

> other matters related to the conduct of the audit, which are to be communicated to the Committee under generally accepted auditing standards, including any "critical audit matters" as defined under said standards.

- Review management's climate risk disclosures within the financial reporting framework and monitor developments in integrated reporting for these areas for alignment with financial reporting.

75.    Regarding the Audit Committee's duties and responsibilities pertaining to "Oversight of Internal Controls, Risk Management, Compliance and Other Legal Matters," the Audit Committee is expected to do the following, among other things:

- Inquire of management, the internal auditor, if any, and the independent auditor about significant risks or exposures and assess the steps management has taken to minimize or control the exposure to such risk to the Company.
- Review legal and regulatory matters that may have a material impact on the financial statements, related Company compliance policies, and programs and reports received from regulators.

- Review, discuss, and monitor management's approach to compliance with legal and regulatory requirements, including: o management's approach to the scope and status of systems or processes, if any, designed to monitor or promote Company compliance with laws, regulations and Code of Business Conduct and Ethics (the "Code");

    review the findings or observations of any examinations or reviews by regulatory agencies and completed compliance activities or audits; o obtain regular updates from management and company legal counsel regarding compliance matters; and

    review management's approach to legal compliance risk management.

* * *

- Establish procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, auditing, or legal compliance matters, and for the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting, auditing, or legal compliance matters.

- Review the Company's process for identifying fraud and make recommendations for modifications to the process as it deems appropriate.

- Review and take appropriate action with respect to any reports to the Committee from legal counsel for the Company concerning any material violation of securities laws or breach of fiduciary duty or similar violation by the Company, its subsidiaries or any person acting on their behalf.

27

76.     In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Sections 14(a) of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

77.     MacroGenics is a Delaware corporation based in Maryland focused on discovering, developing, manufacturing and commercializing innovative antibody-based therapeutics for the treatment of cancer. To this end, the Company has a pipeline of product candidates designed to target either various tumor-associated antigens or immune checkpoint molecules. Two products from the Company's pipeline have been approved by the FDA.

78.     MacroGenics' lead pipeline program is vobra duo, an antibody-drug conjugate (ADC) that targets B7-H3, a molecule in the B7 family of immune regulator proteins that is widely expressed by several different tumor types.

79.     In late 2023, MacroGenics began the TAMARACK Phase 2 study focusing on vobra duo in patients with mCRPC. On November 6, 2023, the Company announced that it had completed enrollment of the TAMARACK Phase 2 study of vobra duo. In a press release

announcing, among other things, progress and anticipated events related to MacroGenics'
investigational product candidates, the Company stated that the TAMARACK study "is designed
to evaluate vobra duo at two different doses, 2.0 mg/kg or 2.7 mg/kg every four weeks, across a
total of approximately 100 patients."

### False and Misleading Statements

*March 7, 2024 Earnings Conference Call*

80.    On March 7, 2024, MacroGenics held an earnings conference call with analysts
and investors to discuss the Company's financial results for the fourth quarter and full year of the
2023 Fiscal Year. During the call, Defendant Koenig was asked a question pertaining to the
Company's expectations for the preliminary TAMARACK data coming up at the American
Society of Clinical Oncology ("ASCO"). Defendant Koenig replied by stating the following:

> Thank you so much, Jonathan. As you've heard me previously, we had taken an
> evaluation of our own data that published recently by Daiichi on the 7,300 molecule
> at ESMO this past fall, and other data that was out there with regard to activity
> against the prostate cancer. And with that, as I have noted, and which we have not
> changed the ranges that we were seeing. Just to recall, we saw about half the
> patients in our 3 mg/kg of Q3 weekly dosing of vobra duo in our expanded
> approximately 40-patient cohort of about half those patients reducing PSA50 from
> baseline.
>
> ***Given the dosing right now of 2.7 mg/kg Q4 and 2 mg/kg Q4 and with
> expectations if the safety is improved as we expect we should be actually
> delivering as much or more of the 2.7 mg/kg Q4 as compared to historical
> treatment with the 3 mg/kg Q3.***[1] As a result, we expect the PSA50 to be in a similar
> range, somewhere between 40% and 60% PSA50 reduction.
>
> With regard to overall response rate, again, as we had previously presented,
> approximately 1/4 of patients achieved both confirmed and unconfirmed responses,
> and this is similar to that which was reported by Daiichi of 25%. So our expectation
> is we should be 25% or greater.
>
> With regard to rPFS, which is the primary endpoint of this study and a very
> important one in terms of obviously prolonging both the life and the quality of life

---

[1] All emphasis is added herein unless otherwise noted.

of these patients. Daiichi reported 5.3 months of rPFS. And what we have said is that we expect to have at least 6 or greater in terms of rPFS going forward.

Now with regard to the specific tumor types, we have selected for study in these expansions, again, taking advantage of our own experiences of treatment of patients with a subset of these tumors as well as the histology and expression of B7-H3 on these tumor types. We think these are very promising tumors to pursue. I should also point out, while we are expanding into 5 different tumors now, we are also considering additional tumors in the future to conduct studies.

### *April 3, 2024 Press Release*

81.     On April 3, 2024, the Company issued a press release purporting to announce its results for the TAMARACK Phase 2 study of vobra duo. The press release summarized a research abstract's findings as to vobra duo's safety profile, in which grade 3 events were under 32% for both doses and no deaths were reported. The press release also included a table containing the safety results, as follows:

|  | Vobra duo 2.0 mg/kg (n=91) | Vobra duo 2.7 mg/kg (n=86) |
|---|---|---|
| Any TEAE | 85 (93.4%) | 82 (95.3%) |
| TEAE Grade ≥ 3 | 23 (25.3%) | 27 (31.4%) |
| Serious AE | 11 (12.1%) | 17 (19.8%) |
| Drug Interruption due to AE | 10 (11.0%) | 16 (18.6%) |
| Drug Discontinuation due to AE | 4 (4.4%) | 2 (2.3%) |
| Fatal AE | 0 | 0 |

82.     In the same April 3, 2024 press release, Defendant Koenig is quoted as stating:

***While the TAMARACK data will not be presented at the ASCO Annual Meeting, we intend to maintain our previously disclosed plan to share further TAMARACK interim data, including updated safety and preliminary efficacy, by the end of May***[.] This updated information will be based upon a future data cut-off. In addition, we still anticipate presenting updated clinical data – including radiographic progression-free survival, or rPFS, the study's primary endpoint – in

the Fall of 2024.

83.     The statements contained in ¶¶ 80-82 above were materially false and/or misleading when made because they failed to disclose that the Company lacked effective internal controls, and omitted materially adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose to investors, *inter alia*, that: (1) the vobra duo's full safety profile; (2) the totality of the Phase 2 TAMARACK study data; and (3) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *2024 Proxy Statement*

84.     On April 8, 2024, MacroGenics filed the 2024 Proxy Statement with the SEC.  The 2024 Proxy Statement was solicited by Defendants Heiden, Koenig, Ferrante, Hurwitz, Jackson, Karson, Liu, O'Brien, Siegel, and Stump. The 2024 Proxy Statement solicited shareholders to approve, *inter alia*: (1) the re-election of Defendants Liu, Jackson, and Stump as directors; (2) ratification of the appointment of Ernst & Young LLP as MacroGenics's independent registered public accounting firm for the fiscal year ending December 31, 2024; (3) an advisory, non-binding resolution to approve the Company's executive compensation; and (4) an amendment to the MacroGenics, Inc. 2023 Equity Incentive Plan to increase the number of shares of our common stock available for issuance thereunder by 2,000,000 shares ("Incentive Plan Amendment").

85.     The 2024 Proxy Statement noted that if the Macrogenics shareholders approved the Incentive Plan Amendment, MacroGenics would "will have a total of approximately 5,139,861 shares available for grant after the Annual Meeting, which includes 2,000,000 new shares available for grant pursuant to the Amended 2023 Plan, plus 3,139,861 shares, which represent the shares

remaining available for issuance under the 2023 Plan." Further, the 2024 Proxy Statement noted

that approval of the Incentive Plan Amendment to the 2023 Plan will "will allow us to continue to

attract and retain highly trained and experienced individuals who are critical to our success,

through the grant of equity awards at levels determined appropriate by our Board or Compensation

Committee" and "will also allow us to utilize equity awards as long-term incentives to secure and

retain the services of current and future employees, non-employee directors and consultants,

consistent with our compensation philosophy and common compensation practice for

biopharmaceutical companies."

86.    Regarding the "Role of Board in Risk Oversight Process," the 2024 Proxy

Statement stated the following, in relevant part:

> Risk assessment and oversight are an integral part of our governance and management processes. Our Board encourages management to promote a culture that incorporates risk management into our corporate strategy and day-to-day business operations. Management discusses strategic and operational risks at regular management meetings, and conducts specific strategic planning and review sessions during the year that include a discussion and analysis of the risks facing us. Throughout the year, senior management reviews these risks with the Board at regular Board meetings as part of management presentations that focus on particular business functions, operations or strategies, and presents the steps taken by management to mitigate or eliminate such risks.

> Our Board does not have a standing risk management committee, but rather administers this oversight function directly through our Board as a whole, as well as through various standing committees of our Board that address risks inherent in their respective areas of oversight. In particular, our Board is responsible for monitoring and assessing strategic risk exposure and our Audit Committee is responsible for overseeing our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including cyber-security. The Audit Committee also monitors compliance with legal and regulatory requirements and considers and, if appropriate, approves any related-person transactions. Our Nominating and Corporate Governance Committee monitors the effectiveness of our corporate governance as well as risks related to our environmental, social and governance ("ESG") strategy and disclosures. Our Compensation Committee assesses and monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking.

87.    Regarding the Company's Corporate Governance and the Code of Conduct, the 2024 Proxy Statement stated the following, in relevant part:

The Board is guided by our Corporate Governance Guidelines, which provide a framework for the governance of the Company and the responsibilities of the Board. The Corporate Governance Guidelines address director qualifications, director access to management and independent advisors and Board responsibilities, as well as the annual performance evaluations of the Board and its standing Committees. In addition, the Company seeks to conduct business ethically and in compliance with applicable laws and regulations. The Company's Code of Business Conduct and Ethics (the "Code") sets forth the principles that guide the Company's business practices. The Code applies to all our employees, officers and directors, including those officers responsible for financial reporting and is included as required training on an annual basis.

The Corporate Governance Guidelines and Code are available under the Corporate Governance section of our website at http://ir.macrogenics.com/governance. We expect that any amendments to the Corporate Governance Guidelines or the Code, or any waivers of its requirements, will be disclosed on our website.

88.    Defendants Heiden, Koenig, Ferrante, Hurwitz, Jackson, Karson, Liu, O'Brien, Siegel, and Stump caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the vobra duo's full safety profile; (2) the totality of the Phase 2 TAMARACK study data; and (3) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

89.    The 2024 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Corporate Governance Guidelines and the Code of Conduct were not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the

Board was not adequately performing its risk oversight functions.

90.    As a result of Defendants Heiden, Koenig, Ferrante, Hurwitz, Jackson, Karson, Liu, O'Brien, Siegel, and Stump causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Liu, Jackson, and Stump to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company; (2) ratify the selection of Ernst & Young LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; (3) approve named executive officer compensation on an advisory, non-binding basis; and (4) approve the Incentive Plan Amendment.

91.    As a result of the shareholders approving the Incentive Plan Amendment, there were an additional 2,000,000 shares available for issuance under the 2023 Plan. The Individual Defendants, including many of whom are current directors of the Company, received material personal benefits that they otherwise would not have received but for the issuance of the false and misleading 2024 Proxy Statement and the shareholders approving the Incentive Plan Amendment. Moreover, certain of the Individual Defendants continue to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to amended 2023 Plan in the future.

### **THE TRUTH EMERGES**

*May 9, 2024 Form 8-K*

92.    On May 9, 2024, the truth emerged when MacroGenics filed a current report on Form 8-K with the SEC attaching as an exhibit a presentation titled "TAMARACK Phase 2 Interim Data." The presentation provided updated safety and efficacy data for the TAMARACK phase 2 study, based on a data cut-off date of April 12, 2024. The updated data indicated that vobra duo's adverse event rate was over 98.9% and 100% for both the 2.0 mg/kg and 2.7 mg/kg dosages,

respectively, and that adverse events grade 3 or greater were over 50% for both dosages. There were five fatalities, three of which are being investigated for possible links to the study.

### May 9, 2024 Press Release

93.    In a press release issued the same day, the Company disclosed the following table summarizing safety data:

| | Vobra Duo 2.0 mg/kg q4W | Vobra Duo 2.7 mg/kg q4W |
|---|---|---|
| **Patients Enrolled** | n=91 | n=90 |
| **PSA Reduction Summary:** | | |
| PSA Evaluable Patients | n=82 | n=71 |
| Any PSA Reduction ≥50% | 41 (50.0%) | 36 (50.7%) |
| Confirmed PSA Reduction ≥50% | 36 (43.9%) | 26 (36.6%) |
| **Tumor Response Summary:** | | |
| RECIST Evaluable Patients with Measurable Disease at Baseline | n=45 | n=32 |
| Disease Control Rate (CR+PR+SD) | 41 (91.1%) | 28 (87.5%) |
| Overall Response Rate (CR+PR, confirmed only) | 8 (17.8%) | 8 (25.0%) |
| Overall Response Rate (CR+PR, including unconfirmed) | 11 (24.4%) | 14 (43.8%) |
| **Safety Summary:** | | |
| Safety Population | n=90 | n=86 |
| Treatment-Emergent Adverse Events All Grade | 89 (98.9%) | 86 (100.0%) |
| Treatment- Emergent Adverse Events Grade ≥3 | 49 (54.4%) | 44 (51.2%) |
| TEAE Leading to Study Drug Discontinuation | 10 (11.1%) | 13 (15.1%) |
| TEAE Leading to Study Drug Dose Reduction | 39 (43.3%) | 44 (51.2%) |
| TEAE Leading to Study Drug Dose Interruption | 38 (42.2%) | 48 (55.8%) |
| Five Most Common TEAE All Grade | Asthenia (46.7%) Nausea (35.6%) Oedema peripheral (32.2%) Decreased appetite (28.9%) Fatigue (25.6%) | Asthenia (58.1%) Decreased appetite (37.2%) Oedema peripheral (36.0%) Nausea (30.2%) Pleural effusion (29.1%) |
| Pleural Effusions | Grade 1=8.9% Grade 2=8.9% No Grade ≥ 3 event | Grade 1=14.0% Grade 2=14.0% Grade 3=1.2% |
| Palmar-plantar Erythrodysaesthesia Syndrome | Grade 1=11.1% Grade 2=4.4% No Grade ≥ 3 event | Grade 1=12.8% Grade 2=9.3% Grade 3=1.2% |

94.    Despite the disappointing data, Defendant Koenig was quoted in the same press release as stating, in relevant part:

> We are very encouraged by the interim updated safety and preliminary efficacy data from the TAMARACK study of vobra duo in metastatic castration-resistant prostate cancer[.] We believe this interim data set helps validate our previously stated hypothesis that improved tolerability coupled with compelling biological activity could be achieved through dose reductions and a longer dosing interval.

We believe vobra duo's biological activity shown to date aligns well with the parameters we outlined at the outset of the study. Based on our evaluation of the interim data to date, we have initiated planning activities for a potential Phase 3 study that could commence next year. We anticipate sharing final safety, efficacy and durability data, including radiographic progression-free survival data, which is the primary endpoint of the study, in the second half of 2024. Furthermore, having preliminarily identified suitable vobra duo doses in mCRPC in the TAMARACK study, we have greater confidence in the molecule's potential to help patients with a broad range of B7-H3-expressing cancers.

95.    On this news, the price of the Company's stock fell 77.4%, or $11.36 per share, from a closing price of $14.67 per share on May 9, 2024 to close at $3.31 per share on May 10, 2024.

**DAMAGES TO MACROGENICS**

96.    As a direct and proximate result of the Individual Defendants' conduct, MacroGenics has lost and will continue to lose and expend many millions of dollars.

97.    Such expenditures include, but are not limited to, the fees associated with the Securities Class Action filed against the Company and the Company's CEO, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

98.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

99.    As a direct and proximate result of the Individual Defendants' conduct, MacroGenics has also suffered and will continue to suffer a loss of reputation and goodwill, and a "lair's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

100.    Plaintiff brings this action derivatively and for the benefit of MacroGenics to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of MacroGenics, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

101.    MacroGenics is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

102.    Plaintiff is, and has been at all relevant times, a shareholder of MacroGenics. Plaintiff will adequately and fairly represent the interests of MacroGenics in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY

103.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

104.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, MacroGenics's Board consisted of Defendants Heiden, Koenig, Ferrante, Hurwitz, Jackson, Karson, Liu, O'Brien, Siegel, and Stump (the "Director-Defendants" or "Directors"). Plaintiff needs only to allege demand futility as to five of the ten Directors that were on the Board at the time this action was filed.

105.    Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme

they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

106.    Moreover, each of the Director-Defendants, that is, Heiden, Koenig, Ferrante, Hurwitz, Jackson, Karson, Liu, O'Brien, Siegel, and Stump, solicited the 2024 Proxy Statement to call for a shareholder vote to, *inter alia*, re-elect Defendants Jackson, Liu, and Stump to the Board, thus allowing them to continue breaching their fiduciary duties to MacroGenics, and approve the Incentive Plan Amendment.

107.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted MacroGenics to issue materially false and misleading statements. Specifically, the Director-Defendants caused MacroGenics to issue false and misleading statements which were intended to make MacroGenics appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

108.    Additional reasons that demand on Defendant Koenig is futile follow. Defendant Koenig serves as CEO and President of the Company and has served as a Company director since co-founding the Company in September 2001. As such, the Company provides Defendant Koenig with his principal occupation for which he receives lucrative compensation. Thus, as the Company admits, he is a non-independent director. As CEO and a director throughout the Relevant Period, Defendant Koenig was ultimately responsible for all of the false and misleading statements and

omissions that were made by or on behalf of the Company. In addition, Defendant Koenig solicited the 2024 Proxy Statement, which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Jackson, Liu, and Stump to the Board. As the Company's highest officer and a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Koenig is a defendant in the Securities Class Action. For these reasons, Defendant Koenig breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

109.    Additional reasons that demand on Defendant Heiden is futile follow. Defendant Heiden has served as a Company director and as the Chair of the Board since May 2022. He also serves as Chair of the Board's Human Capital Management Committee and as a member of the Audit Committee. Defendant Heiden solicited the 2024 Proxy Statement, which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Jackson, Liu, and Stump to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Heiden breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

110.    Additional reasons that demand on Defendant Ferrante is futile follow. Defendant Ferrante has served as a member of the Board since January 2017. Defendant Ferrante also serves

as a member of the Board's Nominating and Governance Committee and Science and Technology Committee. In addition, Defendant Ferrante solicited the 2024 Proxy Statement, which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Jackson, Liu, and Stump to the Board. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Ferrante breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

111.    Additional reasons that demand on Defendant Hurwitz is futile follow. Defendant Hurwitz has served as a member of the Board since October 2004. Defendant Hurwitz also serves as a member of the Board's Nominating and Governance Committee and Science and Technology Committee. Defendant Hurwitz solicited the 2024 Proxy Statement, which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Jackson, Liu, and Stump to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Hurwitz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

112.    Additional reasons that demand on Defendant Jackson is futile follow. Defendant Jackson has served as a member of the Board since January 2017. Defendant Jackson also serves as a member of the Board's Audit Committee. Defendant Jackson solicited the 2024 Proxy

Statement, which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Liu, Stump, and himself to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Jackson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

113.    Additional reasons that demand on Defendant Karson is futile follow. Defendant Karson has served as a member of the Board since January 2023. Defendant Karson also serves as a member of the Board's Audit Committee and Human Capital Management Committee. In addition, Defendant Karson solicited the 2024 Proxy Statement, which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Jackson, Liu, and Stump to the Board. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Karson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

114.    Additional reasons that demand on Defendant Liu is futile follow. Defendant Liu has served as a member of the Board since January 2023. Defendant Liu also serves as a member of the Board's Nominating and Governance Committee and Science and Technology Committee. In addition, Defendant Liu solicited the 2024 Proxy Statement, which contained false and

misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Jackson, Stump, and herself to the Board. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Liu breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

115.    Additional reasons that demand on Defendant O'Brien is futile follow. Defendant O'Brien has served as a member of the Board since February 2021. Defendant O'Brien also serves as Chair of the Board's Audit Committee and as a member of the Human Capital Management Committee. In addition, Defendant O'Brien solicited the 2024 Proxy Statement, which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Jackson, Stump, and Liu to the Board. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant O'Brien breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

116.    Additional reasons that demand on Defendant Siegel is futile follow. Defendant Siegel has served as a member of the Board since November 2017. Defendant Siegel also serves as Chair of the Board's Science and Technology Committee and as a member of the Human Capital Management Committee. Defendant Siegel solicited the 2024 Proxy Statement, which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants

Liu, Stump, and Jackson to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Siegel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

117.    Additional reasons that demand on Defendant Stump is futile follow. Defendant Stump has served as a member of the Board since September 2013. Defendant Stump also serves as Chair of the Board's Nominating and Governance Committee and as a member of the Science and Technology Committee. Defendant Stump solicited the 2024 Proxy Statement, which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Liu, Jackson, and himself to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Stump breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

118.    Additional reasons that demand on the Board is futile follow.

119.    Defendants O'Brien, Heiden, Jackson, and Karson (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable

laws and regulations. During the Relevant Period, they violated the Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

120.    In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

121.    MacroGenics has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for MacroGenics any part of the damages MacroGenics suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

122.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

123.    The acts complained of herein constitute violations of fiduciary duties owed by MacroGenics's officers and directors, and these acts are incapable of ratification.

124.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of MacroGenics. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of MacroGenics, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

125.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause MacroGenics to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

126.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### **FIRST CLAIM**
**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

127.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

128.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

129.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

130.    Under the direction and watch of the Director-Defendants, the 2024 Proxy

Statement failed to disclose that, contrary to the 2024 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing and/or permitting the Company to issue false and misleading statements, and were not complying with the Code of Conduct.

131.    The 2024 Proxy Statement also failed to disclose that: (1) the vobra duo's full safety profile; (2) the totality of the Phase 2 TAMARACK study data; and (3) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

132.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement, including but not limited to, the election of certain Individual Defendants to the Board, and the approval of the amendment to the Incentive Plan.

133.    Specifically, the false and misleading elements of the 2024 Proxy Statement led to, among other things, the re-election of Defendants Liu, Jackson, and Stump, which allowed them to continue to breach their fiduciary duties to MacroGenics, and the approval of the Incentive Plan Amendment.

134.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2024 Proxy Statement.

135.    Plaintiff, on behalf of MacroGenics, has no adequate remedy at law.

**SECOND CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

136.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

137.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of MacroGenics's business and affairs.

138.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

139.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of MacroGenics.

140.    Moreover, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about MacroGenics's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the vobra duo's full safety profile; (2) the totality of the Phase 2 TAMARACK study data; and (3) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

141.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, thus rendering them personally liable to the Company for breaching their fiduciary duties.

142.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

143.    The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

144.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

145.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

146.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, MacroGenics has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

147.    Plaintiff, on behalf of MacroGenics, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Unjust Enrichment

148.    Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

149.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, MacroGenics.

150.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from MacroGenics that was tied to the performance or artificially inflated valuation of MacroGenics, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

151.    Plaintiff, as a shareholder and representative of MacroGenics, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

152.    Plaintiff, on behalf of MacroGenics, has no adequate remedy at law.

<u>**FOURTH CLAIM**</u>
**Against the Individual Defendants for Abuse of Control**

153.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

154.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence MacroGenics, for which they are legally responsible.

155.    As a direct and proximate result of the Individual Defendants' abuse of control, MacroGenics has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

156.    Plaintiff, on behalf of MacroGenics, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

157.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

146.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of MacroGenics in a manner consistent with the operations of a publicly-held corporation.

147.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, MacroGenics has sustained and will continue to sustain significant damages.

148.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

149.    Plaintiff, on behalf of MacroGenics, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

150.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

151.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

152.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

153.     Plaintiff, on behalf of MacroGenics, has no adequate remedy at law.

**SEVENTH CLAIM**
**Against Defendant Koenig for Contribution**
**Under Sections 10(b) and 21D of the Exchange Act**

154.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

155.     MacroGenics and Defendant Koenig are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Koenig's willful and/or reckless violations of their obligations as officers and/or directors of MacroGenics.

156.     Defendant Koenig, because of his positions of control and authority as officer and director of MacroGenics, was able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of MacroGenics, including the wrongful acts complained of herein and in the Securities Class Action.

157.     Accordingly, Defendant Koenig is liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

158.     As such, MacroGenics is entitled to receive all appropriate contribution or indemnification from Defendant Koenig.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)      Declaring that Plaintiff may maintain this action on behalf of MacroGenics, and that Plaintiff is an adequate representative of the Company;

(b)      Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to MacroGenics;

(c)      Determining and awarding to MacroGenics the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)      Directing MacroGenics and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect MacroGenics and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

    1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

    2. a provision to permit the shareholders of MacroGenics to nominate at least four candidates for election to the Board;

    3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)      Awarding MacroGenics restitution from the Individual Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including

reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: December 11, 2024

**THE BROWN LAW FIRM, P.C.**

_  s/ Timothy Brown_____
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
*Counsel for Plaintiff*